UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| VICKI CHILDS and JULIE STILLS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:08-CV-271 |
| | ) | (SHIRLEY) |
| UNITED COMMUNITY BANK, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 15] on defendant United Community Bank's Motion for Summary Judgment. [Doc. 21] On June 24, 2009, the parties appeared before the Court for a hearing on the instant motion. After the hearing, the Court took the motion under advisement and it is now ripe for adjudication. For the reasons set forth more fully below, United Community Bank's motion [Doc. 21] will be **GRANTED**.

**I.    Relevant Facts**

On July 7, 2007, plaintiff Vicki Childs ("Childs") cashed a $700.00 check at the Lenoir City branch of United Community Bank ("Bank"), receiving six $100 dollar bills and five $20 dollar bills. [Doc. 1 at ¶ 7] On July 12, 2007, Childs, accompanied by plaintiff Julie Stills ("Stills"), returned to the Bank and deposited four of the $100 dollar bills she had received from Bank on July

7, 2007.[1]  [Id. at ¶ 8]  After Childs and Stills (collectively, "Plaintiffs") left the Bank, Bank employees determined that two of the $100 dollar bills deposited by Childs were allegedly counterfeit.  [Id. at ¶ 9]  Bank employees contacted the Loudon County Sheriff's Department ("LCSD") and advised the LCSD that Childs had allegedly passed counterfeit currency.  [Id.]

After leaving the Bank, Plaintiffs ran other errands before returning to Childs' home.  [Id. at ¶ 10] Before Plaintiffs returned to Childs' home, the police came by Childs' home looking for Childs.  [Id.]  Additionally, Brent Hurst ("Hurst"), a Bank vice-president, called Childs' home and left a message on Childs' answering machine for Childs to call Hurst as soon as possible.  [Id. at ¶ 11]  Upon returning home, Childs called Hurst, who informed Childs that two of the $100 dollar bills Childs had deposited were allegedly counterfeit.  [Id. at ¶ 12]  After learning this, Plaintiffs returned to the Bank to attempt to resolve the matter.  [Id. at ¶ 13]

Upon arriving at the Bank, Plaintiffs entered the Bank and waited in the lobby for Hurst to finish speaking with someone.  [Id. at ¶ 14]  While the Plaintiffs waited for Hurst, LCSD deputies arrived at the Bank and one of the deputies, Chad Estes ("Estes"), entered the Bank.  [Id. at ¶ 15] Upon entering the Bank, Estes drew his weapon and ordered the Plaintiffs to raise their hands.  [Id.] Childs told Estes that, because of a disability, she could not raise her hands, to which Estes, raising his voice and using profanity, again ordered the Plaintiffs to raise their hands.  [Id.]  The Plaintiffs were handcuffed, removed from the Bank's lobby, and placed over the hood of the patrol car

---

[1]There is a question of fact as to whether the currency deposited by Childs was the same currency she received from the Bank on July 7, 2007.  However, for the purposes of the instant motion, the original source of the deposited bills is not material.  Therefore the Court proceeds with the summary judgment analysis assuming that the Plaintiffs' allegations are true and that the currency deposited was the same currency Childs received on July 7.

2

outside. [Id. at ¶ 17-18] No Bank employees acted to prevent the detention of the Plaintiffs. [Id. at ¶ 16]

While the Plaintiffs were being detained outside, another Bank employee, Nathan Howard ("Howard"), walked over to the Plaintiffs and Estes, stated that the Plaintiffs should be arrested for counterfeiting, that their vehicle should be impounded, and called Childs a liar when she indicated that she had received the allegedly counterfeit bills from the Bank. [Id. at ¶ 21] Sometime thereafter, Estes transported the Plaintiffs to the Loudon County Justice Center, where the Plaintiffs were interrogated by Detective Patrick Upton of the LCSD. [Id. at ¶ 25, 27] The Plaintiffs were latter released from police custody and no criminal charges were ever filed. [Id. at ¶ 35, 36] The parties agree that at no time did any Bank employee physically touch the Plaintiffs.

## II.    Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., 475 U.S. at 587. To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

3

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Id. at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

### III. Positions of the Parties

Defendant Bank moves the Court to grant summary judgment as to all of the Plaintiffs' claims against it, arguing that even when the facts are viewed in the light most favorable to the Plaintiffs, the Plaintiffs cannot establish prima facie claims against the Bank. The Plaintiffs oppose the motion, arguing that the Plaintiffs' claims as to the Bank are sufficient to reach a jury and that the motion should be denied. The Plaintiffs' claims as to the Bank can be grouped into five categories: civil conspiracy, § 1983 claims; outrageous conduct; false arrest and imprisonment; and assault and battery. The Court will consider each of these claims in turn.

### IV. Civil Conspiracy

The Plaintiffs allege that the Bank, acting through its employees, entered into a civil conspiracy with law enforcement officers to violate the Plaintiffs' civil rights and to otherwise commit various tortious acts against the Plaintiffs. In addressing claims of civil conspiracy, the Sixth Circuit has held as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details

4

>     of the illegal plan or all of the participants involved. All that must be
>     shown is that there was a single plan, that the alleged coconspirator
>     shared in the general conspiratorial objective, and that an overt act
>     was committed in furtherance of the conspiracy that caused injury to
>     the complainant.

Mettetal v. Vanderbilt Univ., 147 Fed. App'x. 577, 585 (6th Cir. 2005) (quoting Hooks v. Hooks, 771 F.2d 935, 943-44 (6th Cir. 1985)). The Sixth Circuit has further held that:

>     In Tennessee, a civil conspiracy is a "combination between two or
>     more persons to accomplish by concert an unlawful purpose, or to
>     accomplish a purpose not in itself unlawful by unlawful means."
>     Chenault v. Walker, 36 S.W.3d 45, 52 (Tenn. 2001) (citation and
>     quotation marks omitted). "Each conspirator must have the intent to
>     accomplish this common purpose, and each must know of the other's
>     intent." Brown v. Birman Managed Care, Inc., 42 S.W.3d 62, 67
>     (Tenn. 2001).

Pressman v. Franklin Nat'l Bank, 384 F.3d 182, 188 (6th Cir. 2004). Additionally, courts have recognized that:

>     Civil conspiracies "are rarely proven directly. They are more often
>     established using circumstantial evidence and inferences drawn from
>     the evidence, coupled with common-sense knowledge of the behavior
>     of persons in similar circumstances. Thus, fact-finders may consider
>     the nature of the acts themselves, the relationship of the parties, the
>     interests of the conspirators, and other circumstances."

First Am. Title Ins. Co. v. Cumberland County Bank, No. 2:07-0072, 2009 U.S. Dist. LEXIS 34597 (M.D. Tenn. Apr. 20, 2009) (quoting Stanfill v. Hardney, No. M2004-02768-COA-R3-CV, 2007 Tenn. App. LEXIS 620, at *8 (Tenn. Ct. App. Sept. 27, 2007)). Finally, the Court notes that under Tennessee law, "[c]onspiracy claims must be pled with some degree of specificity. Conclusory allegations, however, unsupported by material facts will not be sufficient to state such a claim." Kincaid v. SouthTrust Bank, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006).

With all of this jurisprudence in mind, the Court turns to the instant case. The only reference to a civil conspiracy in the Plaintiffs' Complaint states that "[t]he conduct of Defendants is sufficient

5

to establish that the Defendants were engaged in a conspiracy to deny Plaintiffs of their rights as guaranteed by the Fourth Amendment of the United States Constitution and do so under color of state law." [Doc. 1 at ¶ 39] However, there is no evidence before the Court, nor even a specific allegation in the Complaint, that Howard and Estes actually conspired to unlawfully arrest the Plaintiffs, nor that Howard and Estes both intended to unlawfully arrest the Plaintiffs (as opposed to an intent to lawfully arrest). Furthermore, assuming *arguendo* that Howard did intend to have Plaintiffs unlawfully arrested, there is no evidence that Estes shared Howard's intention. Nor does there appear to have been a joint plan, let alone an illegal plan, to unlawfully arrest the Plaintiffs, nor any shared objective. Thus, the Court finds that the Complaint does not plead the claim of civil conspiracy with the level of specificity required under Tennessee law, and that the civil conspiracy claim must therefore fail.

However, even if the Court were to find that the civil conspiracy claim was properly pled, the Court would still find that the civil conspiracy claim must fail. Given the facts before the Court, the circumstantial evidence of a civil conspiracy is far too tenuous to survive summary judgment. After considering the nature of the acts in question, the relationship of the parties, the interests of the conspirators, and the other circumstances related to the events in question, the Court finds that there is simply no evidence that Bank employees conspired with the police to violate the Plaintiffs' constitutional rights or commit tortious acts against the Plaintiffs. Rather, the only evidence before the Court is that Howard simply urged the police to arrest the Plaintiffs and impound their car. The Court finds that such urging, standing alone, is insufficient to support a claim of civil conspiracy. In the absence of some evidence of a conspiratorial relationship, the Court finds that there is no genuine issue of material fact, and that, under the facts herein, no reasonable jury could find that the

Bank and law enforcement officers were engaged in a civil conspiracy to harm the Plaintiffs. Accordingly, the defendant Bank is entitled to judgment as a matter of law, and the Plaintiffs' claim of civil conspiracy, and any claims reliant on the claim of civil conspiracy, must fail.

**V.     § 1983 Claims**

Having addressed the civil conspiracy claim, the Court turns to the remaining substantive claims, beginning with the Plaintiffs' § 1983 claim. To prevail on a § 1983 claim, a plaintiff "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." Radvansky v. City of Olmsted Falls, 395 F.3d 291, 302 (6th Cir. 2005) (quoting Waters v. City of Morristown, 242 F.3d 353, 358-59 (6th Cir. 2001)). Section 1983 does not create rights but "merely provides remedies for deprivations of rights established elsewhere." Radvansky, 395 F.3d at 302 (quoting Gardenhire v. Schubert, 205 F.3d 303, 310 (6th Cir. 2000)). A plaintiff in a § 1983 case is required to identify which substantive constitutional or federal rights he is claiming were violated. Barrett v. Steubenville City Sch., 388 F.3d 967, 971 (6th Cir. 2004) (citing Spadafore v. Gardner, 330 F.3d 849, 852-53 (6th Cir. 2003).

In the instant case, the Plaintiffs allege that the defendant Bank is liable under § 1983 for violations by Bank employees of the Plaintiffs' Fourth Amendment rights. Plaintiffs argue that the defendant Bank, which under normal circumstances would not be considered a state actor, effectively became a state actor when Howard, a Bank employee, became involved in the police action against the Plaintiffs' by urging Estes to arrest the Plaintiffs and impound their vehicle. The parties agree that there are questions of fact as to whether Howard made the comments alleged by the Plaintiffs, but the Bank argues that even if the Plaintiffs' allegations were true, the Plaintiffs'

7

claims as to the Bank must still fail. Thus, for the purposes of summary judgment, the Court proceeds with its analysis assuming as true the facts alleged by the Plaintiffs.

The Sixth Circuit, in addressing when the actions of a private person or entity should be attributed to the state, has ruled as follows:

> This circuit recognizes three tests for determining whether private conduct is fairly attributable to the state: the public function test, the state compulsion test, and the nexus test. The public function test "requires that the private entity exercise powers which are traditionally exclusively reserved to the state …." The typical examples are running elections or eminent domain. The state compulsion test requires proof that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state. Finally, the nexus test requires a sufficiently close relationship (i.e., through state regulation or contract) between the state and the private actor so that the action taken may be attributed to the state.

Ellison v. Garbino, 48 F.3d 192, 195 (6th Cir. 1995) (internal citations omitted). In order to establish their § 1983 claim against the Bank, the Plaintiffs bear the burden of proving that the Bank satisfies one of these three tests. Id. at 196. During the June 24, 2009, hearing, Plaintiffs' counsel advised the Court that the Plaintiffs rely solely on the public function test. Accordingly, the Court need not consider the state compulsion test, nor the nexus test.

As the Court noted above, "[t]he public function test 'requires that the private entity exercise powers which are traditionally exclusively reserved to the state ….' The typical examples are running elections or eminent domain." Id. at 195. In addressing the public function test, the Sixth Circuit has held that "[p]roviding information to the police, responding to questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken 'under color of law.'" Moldowan v. City of Warren, No. 07-2115/2116/2117, 2009 U.S. App. LEXIS 14238, at *113 (6th Cir. July 1, 2009) (citing Benavidez v. Gunnell, 722 F.2d 615,

8

618 (10th Cir. 1983) ("We know of no case in which the report of a state crime is action under color of state law under § 1983. The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under §§ 1983 or 1985.")).

Additionally, in addressing whether a private security guard, employed by a department store, became a public actor by stopping and searching an individual whom the guard believed had stolen merchandise from the store, the Sixth Circuit held that:

> Under the public function test, a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the state. The public function test has been interpreted narrowly. Only functions like holding elections, see Flagg Bros. v. Brooks, 436 U.S. 149, 157-58 (1978), exercising eminent domain, see Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352-53 (1974), and operating a company-owned town, see Marsh v. Alabama, 326 U.S. 501, 505-09 (1946), fall under this category of state action. Our sister circuits have consistently held that the mere fact that the performance of private security functions may entail the investigation of a crime does not transform the actions of a private security officer into state action. See Wade v. Byles, 83 F.3d 902, 905 (7th Cir. 1996); Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1457 (10th Cir. 1995); White v. Scrivner Corp., 594 F.2d 140, 142-43 (5th Cir. 1979).
>
> In White, for example, the Fifth Circuit held that the detention of a suspected shoplifter is not an exclusive state function. A merchant's detention of persons suspected of stealing store property simply is not an action exclusively associated with the state. Experience teaches that the prime responsibility for protection of personal property remains with the individual. A storekeeper's central motivation in detaining a person whom he believes to be in the act of stealing his property is self-protection, not altruism. Such action cannot logically be attributed to the state. 594 F.2d at 142 (citation omitted). Applying these principles to Chapman's claim, we are satisfied that the Dillard's security officer was not performing a function exclusively reserved to the State when he stopped and searched Chapman. Under the public function test, there was no state action.

Chapman v. Higbee Co., 319 F.3d 825, 834 (6th Cir. 2003).

9

With this jurisprudence in mind, the Court finds that the Plaintiffs cannot establish that the actions of the Bank and its employees satisfies the public function test, and therefore there was no state action by the Bank, foreclosing the Plaintiffs' claims against the Bank under § 1983. As the Sixth Circuit noted in Chapman, a merchant is allowed to briefly detain a person suspected of stealing merchandise. In this instance, the Bank suspected the Plaintiffs of depositing counterfeit currency, the equivalent of stealing from the Bank. Under Chapman, Bank employees would have been allowed to briefly detain the Plaintiffs to investigate their suspicions without becoming state actors, but the actions of the Bank and its employees fell far below that level. Rather than actually detaining the Plaintiffs, Bank employees merely contacted the police, and then Howard urged the police to detain the Plaintiffs. Reporting a crime is insufficient to convert a private actor into a state actor. Moldowan, 2009 U.S. App. LEXIS 14238, at *113. Similarly, the Court finds that the mere urging of police to detain the Plaintiffs, something the Bank itself could have done under Chapman without becoming a state actor, is insufficient to convert the Bank into a state actor.

Additionally, the Court finds that there is no evidence that law enforcement were in any way bound to obey Howard. The officers on the scene were the only ones with the power to arrest the Plaintiffs, and the decision to arrest remained in the hands of the police, not Howard. Howard's suggestions to the officers were nothing more than that, suggestions, and given the narrow interpretation of the public function test, the Court finds that such suggestions were insufficient to convert the Bank into a state actor. In the absence of state action by the Bank, the Plaintiffs' § 1983 claims against the Bank must fail. Accordingly, the Bank's motion for summary judgment **[Doc. 21]** will be **GRANTED** as to the Plaintiffs' § 1983 claims.

## VI.  Outrageous Conduct

The Plaintiffs next allege that the actions of the Bank, through its employees, were so outrageous as to render the Bank liable under Tennessee common law. The tort of outrageous conduct is defined as follows:

> Liability for the tort of "outrageous conduct" exists only where (1) the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury. Medlin v. Allied, Investment Co., 398 S.W.2d 270 (1966). "The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." Restatement of Torts(2d), section 46, comment (d), quoted with approval in Medlin, 398 S.W. 2d at 274.

Jones v. Tennessee Valley Authority, 948 F.2d 258, 266 (6th Cir. 1991) (quoting C.D. Swallows v. Western Electric Co., 543 S.W.2d 581 (Tenn. 1976)).

The conduct at issue in the instant case is Howard's alleged statement that the Plaintiffs were lying about where they had obtained the allegedly counterfeit bills and his subsequent urging of the police to arrest the Plaintiffs and impound their vehicle. Viewing the facts in the light most favorable to the Plaintiffs, the Court finds that the Plaintiffs' allegations fail to rise to the level necessary to support a claim for outrageous conduct. Howard's accusation that the Plaintiffs were lying was nothing more than an insult and indignity, and is insufficient to support a claim of outrageous conduct.

As for Howard's suggestion that the Plaintiffs' be arrested and their vehicle impounded, as the Court noted above, that was nothing more than a suggestion. Howard had no authority to order the police to arrest the Plaintiffs, but rather the decision was solely up to the officers on the scene. Thus, the Court finds that Howard's request to the police was nothing more than another indignity

11

and annoyance, and falls far below the level of behavior that is "regarded as atrocious and utterly intolerable in a civilized society." Given that no Bank employees actually touched the Plaintiffs, and given that the comments allegedly made by Howard fail to rise to the level necessary to support a claim of outrageous conduct, the Court finds that the Plaintiffs' outrageous conduct claim as to the Bank must fail. Accordingly, the Bank's motion for summary judgment **[Doc. 21]** will be **GRANTED** as to the Plaintiffs' outrageous conduct claims.

## VII. False Arrest and Imprisonment

The Plaintiffs next allege that the Bank, through a civil conspiracy with the police, is liable for the false arrest and imprisonment of the Plaintiffs. Under Tennessee law, for the Plaintiffs to prevail on their claim of false arrest, they must show that "(1) [they] was restrained or detained against [their] will, and (2) the restraint or detention was unlawful." Williams v. Leatherwood, 258 Fed. App'x. 817, 824 (6th Cir. 2007) (quoting Coffee v. Peterbilt of Nashville, Inc., 795 S.W.2d 656, 659 (Tenn. 1990)). Similarly, "[t]he elements of the tort of false imprisonment are (1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." Coffee, 795 S.W.2d at 659.

In light of the Court's finding above as to the Plaintiffs' civil conspiracy claim, the Court finds that the claims of false arrest and false imprisonment must also fail. The only evidence before the Court is that the police, not Bank employees, were responsible for detaining the Plaintiffs. There is no evidence that Bank employees were directly involved in the arrest and detention of the Plaintiffs, and thus the Plaintiffs cannot prevail against the Bank on such claims. In the absence of a valid claim of civil conspiracy, the Bank's motion for summary judgment **[Doc. 21]** will be **GRANTED** as to the Plaintiffs' claims of false arrest and false imprisonment.

12

**VIII. Assault and Battery**

The Plaintiffs next allege that the Bank, through a civil conspiracy with the police, is liable for the assault and battery of the Plaintiffs by law enforcement. Tennessee courts have described the torts of assault and battery as follows:

> "An assault is an attempt, or the unequivocal appearance of an attempt, to do a corporal injury to another, the intent to do harm being essential. Rushing v. State, 268 S.W.2d 563, 567 (Tenn. 1954) (citations and quotations omitted). "A battery is any unlawful beating, or other wrongful physical violence or constraint, inflicted on a human being without his consent." Id. (citations and quotations omitted).

Alexander v. Beale St. Blues Co., 108 F. Supp. 2d 934, 945-946 (W.D. Tenn. 1999). Thus, in the absence of a civil conspiracy, in order to be liable for assault and battery, some employee of the Bank must have touched the Plaintiffs. Such was not the case. There is no evidence before the Court that any Bank employee touched the Plaintiffs, and in the absence of a valid civil conspiracy claim, the Bank cannot be held liable for the alleged assault and battery of the Plaintiffs by the police. Accordingly, the Bank's motion for summary judgment **[Doc. 21]** will be **GRANTED** as to the Plaintiffs' claims of assault and battery.

13

## IX. Conclusion

For the reasons set forth more fully above, the Bank's motion **[Doc. 21]** is hereby **GRANTED,** and all claims against United Community Bank are **DISMISSED with prejudice**. The Court will hear arguments as to the remaining defendants' motion for summary judgment [Doc. 34] on August 10, 2009, at 9:30 a.m.

ORDER ACCORDINGLY:

**ENTER:**

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

14