UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| VICKI CHILDS and JULIE SILLS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 3:08-CV-271 |
| ) | (SHIRLEY) |
| ) | |
| TIM GUIDER, in his official capacity as ) | |
| Sheriff of Loudon County, Tennessee, ) | |
| LOUDON COUNTY, TENNESSEE, and ) | |
| CHAD ESTES, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 15]. The remaining Defendants in this action—Tim Guider, Chad Estes, and Loudon County, Tennessee—filed a Motion for Summary Judgment on July 6, 2009. [Doc. 34]. The Plaintiffs responded to the motion on August 17, 2009, and the Defendants filed a final reply on August 20, 2009. The parties appeared before the Court on August 28, 2009, for a hearing on this matter.

**I.    FACTS**

Plaintiff Vickie Childs ("Ms. Childs") cashed a check at United Community Bank on July 7, 2007, and on July 12, 2007, she returned to the bank and allegedly tendered the same $100 bills as her mortgage payment. After the Ms. Childs left the bank, it was determined that the bills were

counterfeit. Meredith Tinnel ("Ms. Tinnel"), the teller who received the payment, contacted Lieutenant Vittatoe ("Lt. Vittatoe") of the Loudon County Sheriff's Department ("LCSD"). Around the same time, United Community Bank's Vice President Brett Hurst telephoned Ms. Childs. Ms. Childs returned to the bank with Plaintiff Julie Sills ("Ms. Sills"), to attempt to resolve the matter. When the women returned, Ms. Tinnel was on the phone with her mother Cissy Chapman ("Ms. Chapman"), a local judicial commissioner, and Ms. Tinnel told Ms. Chapman that the customer who had passed the counterfeit bills was back.

Ms. Chapman conveyed this information to Lt. Vittatoe, and Lt. Vittatoe radioed in a dispatch requesting an officer in the area to go to the Bank.[1] Deputy Chad Estes ("Deputy Estes") responded and detained Ms. Childs and Ms. Sills, by handcuffing them and placing them in the back of his cruiser. Ms. Childs and Ms. Sills were transferred to Detective Patrick Upton's police cruiser and transported to the Loudon County Justice Center, where they were interrogated.

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable

---

[1]The parties dispute the exact statements conveyed from Ms. Tinnel to Ms. Chapman, from Ms. Chapman to Lt. Vittatoe, and Lt. Vittatoe to Deputy Estes, and for the reasons more fully explained below, the Court finds that a genuine issue and dispute persists as to these material facts.

2

to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Id. at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

### III. ANALYSIS

For the reasons more fully explained below, the Court finds that Defendant Sheriff Tim Guider is entitled to summary judgment in his favor on all claims against it. However, Defendant Deputy Estes and Defendant Loudon County are not entitled to summary judgment in their favor on the claims against them.

#### A. Sheriff Tim Guider

As an initial matter, the Defendant has moved to dismiss the claims against Sheriff Tim Guider, in his official capacity, because they mirror the claims made against Loudon County and are therefore redundant. The Supreme Court of the United States has previously held that official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. See Kentucky v. Graham, 473 U.S. 159, 165 (1985). The Court of Appeals for the Sixth Circuit has

3

concluded that official capacity suits should be dismissed where the same claims are also brought against the county. See Jackson v. Shelby County Gov't., 2008 WL 4915434, at *2 (6th Cir. November 10, 2008) ("[T]he district court properly granted summary judgment to the defendants on the claims against the sheriff in his official capacity because those claims mirror the claims against the County, and are therefore redundant.").

Accordingly, the Court finds that the Plaintiff has pled identical claims against both Sheriff Tim Guider, in his official capacity, and Loudon County. Because these claims mirror one another, the Court finds that they are redundant, and Sheriff Guider shall be **GRANTED** summary judgment in his favor on all claims pending against him.

**B.     Deputy Estes**

The Plaintiffs have made a variety of claims against the Deputy Estes, based upon both state and federal law, including: wrongful arrest; false imprisonment; excessive force; assault and battery; unlawful seizure; and intentional/reckless infliction of emotional distress and/or outrageous conduct. [Doc. 1 at 7-8].[2] In the face of these allegations, Deputy Estes claims that the Plaintiffs were merely detained and were not arrest. Alternatively he argues that if an arrest took place, it was supported by probable cause, and finally, he maintains that he is entitled to qualified immunity as a government official.

*1.     Arrest*

Deputy Estes argues that he merely detained the Plaintiffs and did not arrest them. The Plaintiffs maintain that they were arrested. The Court agrees with the Plaintiffs and finds that the

---

[2]The Complaint does not isolate the claims through the use of headings or specific paragraphs. This is a summary of the claims as they appear on the face of the Complaint.

4

Plaintiffs were in fact arrested not merely detained as part of an investigatory detention or a <u>Terry</u> stop. Stated differently, even if the Plaintiffs were originally detained as part of investigatory detentions or <u>Terry</u> stop, the detention escalated into a full blown arrest, as the Plaintiffs were handcuffed and put into a cruiser to be transported to a different location.

In <u>Walters v. Stafford</u>, 317 Fed. App'x 479 (6th Cir. 2009), another case involving allegations of use of excessive force by law enforcement officers, the Court of Appeals for the Sixth Circuit succinctly summarized the legal standard for determining when a <u>Terry</u> stop escalates to an arrest. The court in <u>Walters</u> explained:

> A "seizure" occurs when "there is a governmental termination of freedom of movement through means intentionally applied," <u>Scott</u>, 127 S.Ct. at 1776, and where "a reasonable person would have believed that he was not free to leave," <u>United States v. Mendenhall</u>, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Brief investigatory seizures, or " Terry stops," are not unreasonable if: (1) an "officer's action was justified at its inception," and (2) the action "was reasonably related in scope to the circumstances which justified the interference in the first place." <u>United States v. Perez</u>, 440 F.3d 363, 369-70 (6th Cir. 2006) (quoting <u>Terry,</u> 392 U.S. at 20, 88 S.Ct. 1868). The first Terry requirement is satisfied where there is "reasonable suspicion supported by articulable facts that criminal activity may be afoot." <u>Id.</u> at 370 (quoting <u>United States v. Sokolow</u>, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). The second Terry requirement is met if the detention lasts no longer than necessary to effectuate the purpose of the seizure. <u>Id.</u> at 372. On the other hand, "[w]hen police actions go beyond checking out the suspicious circumstances that led to the original [Terry] stop, the detention becomes an arrest that must be supported by probable cause." <u>Smoak v. Hall</u>, 460 F.3d 768, 780-81 (6th Cir. 2006) (citation and quotation marks omitted). In determining whether this line has been crossed, we consider "the length of the detention, the manner in which it is conducted, and the degree of force used." <u>Id.</u>

<u>Walters</u>, 317 Fed. App'x at 485 n. 6.

Applying these factors and considerations to the present case, the Court finds that the detention of the Plaintiffs, arguably, was never intended as an investigation, and even assuming it was, it quickly escalated beyond an investigatory stop. The Court initially finds that no investigation was conducted. Lt. Vittatoe stated in his deposition that Deputy Estes radioed back after he "made contact" with the Plaintiffs asking what to do with them, to which Vittatoe replied to bring them down to the justice center because Lt. Vittatoe "wanted to talk to them about it." [Doc. 35-1 at 9-10]. Lt. Vittatoe also stated that Deputy Estes, "doesn't investigate felony offenses or counterfeit situations any time so therefore, we asked him to bring them to us." [Doc. 44 at 151]. Thus, Deputy Estes was not instructed to, nor did he, investigate the situation, he went to make contact with the Plaintiffs and bring them to talk with Lt. Vittatoe.

As Lt. Vittatoe himself explained the situation, " I asked [Deputy Estes] to bring them here so that's, you know, there's— I guess detain and arrested is, you know— I guess in terms that we always talk about we're going to charge somebody, we're going to handcuff you and arrest you is . . . not consistent with the actual term of what an arrest is. . . ." Lt. Vittatoe continued his explanation by conceding , "I asked him to bring them here so that would probably constitute an arrest at that point but they weren't to be charged." [Doc. 35-1 at 10]. Lt. Vittatoe confirmed that the women were not asked to voluntarily come to the Justice Center. [Doc. 35-1 at 11]. Instead, Lt. Vittatoe said he told Deputy Estes to bring the women to the Justice Center. [Doc. 35-1 at 11]. The Court finds that Lt. Vittatoe is correct that at the point the women were handcuffed and detained for transportation to the Justice Center, they were under arrest.

Second, the detention was not brief and was not sufficiently tailored to last only long enough to effectuate the purpose of the seizure. While both women estimate that the detention was longer,

6

Deputy Estes estimated that he was at the bank for thirty minutes prior to the women being transferred to Officer Upton's cruiser. [Doc. 35-2 at 4]. Thus, the seizure lasted at least thirty minutes despite the fact that Deputy Estes was not undertaking any investigation and continued during their transfer to Officer Upton's crusier, transportation to the detention center, and then during questioning. There was no indication the women were armed or violent, and the record indicates that all the players were familiar with one another. In contrast to cases where circumstances necessitated longer detentions, see Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809 (6th Cir. 1999) (classifying a detention of about thirty minutes as an investigatory detention where the officers had reason to believe that the suspects were armed or their was a serious threat to safety that required a longer, more aggressive detention); Jewett v. Anders, 521 F.3d 818 (7th Cir. 2008) (holding that length of detention at thirty to forty minutes did not convert investigatory stop into an arrest where officer had to confirm suspect's identity and then write citation), there was simply no reason that this detention could not have been brief.

Finally, the Plaintiffs' liberty was restricted in such a way that they would not have believed they were free to leave. The Plaintiff were almost immediately handcuffed upon Deputy Estes' arrival at the scene. Thereafter, their movement was constrained, and soon after, they were placed in the back seat of a cruiser which further constricted their movement and all but eliminated the option of leaving the scene. Sometime shortly thereafter, the officers on the scene began the process of impounding Ms. Childs' truck, which only reiterated to the Plaintiffs that they were not leaving the scene of their own volition. [See Doc. 44 at 71 and 111]. Deputy Estes, himself, confirmed that the women were not free to leave. [Doc. 35-2 at 3].

In sum, the Court finds that Deputy Estes placed the Plaintiffs under arrest, because a reasonable person in the Plaintiffs' position would not have believed they were free to leave, and, in fact, the women were not free to leave. See Freeman v. Gore, 483 F.3d 404, 413 (5th Cir. 2007) (finding that a reasonable person handcuffed and placed in the back of the police car for thirty to forty-five minutes "would surely believe that she had been restrained to an extent that normally accompanies a formal arrest").

*2. Probable Cause*

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and a warrantless arrest by a law officer is reasonable under the Fourth Amendment only where there is probable cause to believe that a criminal offense has been or is being committed. Davenpeck v. Alford, 543 U.S. 146, 152 (2004). Thus, in order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause. Painter v. Robertson, 185 F.3d 557, 569 (6th Cir.1999). A police officer has probable cause if there is a "fair probability" that the individual to be arrested has either committed or intends to commit a crime. Northrop v. Trippett, 265 F.3d 372, 379 (6th Cir. 2001) (quoting United States v. Sokolow, 490 U.S. 1, 7(1989)). The existence of probable cause is generally a question of fact for the jury to determine, unless only one reasonable determination can be made. Gardenhire v. Schubert, 205 F.3d 303, 315 (6th Cir. 2000).

In the present case, Deputy Estes effected a warrantless arrest, thus, Deputy Estes was required to have probable cause to believe both that a crime was committed and that these Plaintiffs had committed the crime before making the arrest. The Court has examined the depositions and

8

sworn statements of the witnesses in this matter, and in light of these statements, including those summarized below, the Court concludes that a genuine issue of material fact persists as to whether Deputy Estes had probable cause to arrest Ms. Childs and Ms. Sill.

In her deposition, Ms. Tinnel described the conversations she had with Lt. Vittatoe regarding persons passing counterfeit money at the bank. Ms. Tinnel stated that initially she spoke with her mother, Cissy Chapman, who is a judicial commissioner for Loudon County, and Ms. Chapman gave her Lt. Vittatoe's name and number. [Doc. 44 at 126-27]. Ms. Tinnel said she then called Lt. Vittatoe and told him that the bank "had received a couple counterfeit hundreds." [Doc. 44 at 129]. Ms. Tinnel said that she told Lt. Vittatoe that Vicki Childs was the person who brought the bills in. [Doc. 44 at 129]. Ms. Tinnel explained that later in the afternoon when she was on the phone with Ms. Chapman discussing another matter, she told Ms. Chapman that the woman who had passed the bills was back without using a name. [Doc. 44 at 131]. Ms. Tinnel said she thought another woman was with Ms. Childs, but Ms. Tinnel said she was not familiar with the other woman. [Doc. 44 at 131].

According to Ms. Tinnel, Ms. Chapman told Officer Billy Hall, a narcotics investigator that happened to be in her office at the time, that the customer who had passed the bills was back in the bank. [Doc. 44 at 132]. Ms. Tinnel said she was not aware of Ms. Chapman contacting Lt. Vittatoe. [Doc. 44 at 133].

In his deposition, Lt. Vittatoe stated that, in their initial conversation, Ms. Tinnel said, "I just wanted to let you know we had a couple ladies come in and made [sic] a deposit that included some hundred dollar bills and I think some of them may be counterfeit." [Doc. 35-1 at 4]. Lt. Vittatoe recalled that approximately an hour passed, and he then received an interoffice call from Ms.

9

Chapman who said "those women are at the bank again," without elaborating. [Doc. 35-1 at 7]. Lt. Vittatoe said that, after receiving this follow up information, he retrieved his portable radio and found the closest unit to the bank, which turned out to be Deputy Estes. [Doc. 35-1 at 7-8]. Lt. Vittatoe recalled that he informed Deputy Estes, as follows:

> I said, if you don't care, I said run out to United Community Bank, there's a couple of ladies in the bank that may be in possession of some counterfeit money. It's the second time they have been in the bank today. And I told him, I'm pretty sure I told him . . . Vicki's name on the radio.

[Doc. 35-1 at 8]. Lt. Vittatoe recalled that he told Deputy Estes to "[s]ee if he could make contact," with the women. [Doc. 35-1 at 9].

In his deposition, Deputy Estes recalled Lt. Vittatoe asking if he could go to the United Community Bank because there were "two subjects there attempting to pass counterfeit money." [Doc. 35-1 at 48]. Deputy Estes stated that when he came into the bank there were two females inside of the bank. [Doc. 35-1 at 48]. Deputy Estes did not recall Lt. Vittatoe giving him the women's names. [Doc. 35-1 at 48]. However, he stated that he thought Lt. Vittatoe had given him clothing descriptions, which were that the women both had on ballcaps, and that Lt. Vittatoe said the women were standing at the center of the bank. [Doc. 35-1 at 48]. Deputy Estes did not recall Lt. Vittatoe giving him any other information.

Deputy Estes stated that he was called to the scene because the women identified by Lt. Vittatoe were "passing counterfeit money." [Doc. 35-2 at 2]. Deputy Estes stated that his understanding of the situation was that he "had someone there passing counterfeit money and [he] was to defuse the situation and take control of it until [he] could speak to investigators and employees of the bank." [Doc. 35-2 at 3].

10

Thus, according to Lt. Vittatoe, he told Deputy Estes that there were "a couple of ladies in the bank" that "may be in possession of some counterfeit money." Lt. Vittatoe also said he mentioned Ms. Child's name to Deputy Estes. [Doc. 35-1 at 8]. In contrast to Lt. Vittatoe's characterization of the women *maybe possessing* counterfeit money, Deputy Estes stated that Lt. Vittatoe told him that there were "two subjects . . . attempting to pass counterfeit money" without mentioning names, but Deputy Estes said that Lt. Vittatoe may have conveyed clothing descriptions. [Doc. 35-1 at 48]. Because Deputy Estes was relying solely upon his instructions from Lt. Vittatoe and because Lt. Vittatoe was relying upon second and third hand information rather than his own personal knowledge, the exact details of what was said to Deputy Estes are vital to determining probable cause, and at this juncture, there is a genuine issue as to what was said.

Certainly on this record the Court cannot find probable cause existed as a matter of law. To the contrary, there are genuine issues of material fact as to whether Deputy Estes arrested the Plaintiffs with or without probable cause. Accordingly, because there are material facts as to probable cause that are genuinely disputed the Court finds that this fact-specific inquiry and determination must be left to the jury, Gardenhire, 205 F.3d at 317, and therefore, Deputy Estes' prayer for summary judgment in his favor is not well-taken.

3.  *Qualified Immunity*

Even if Deputy Estes did not have probable cause to arrest the Plaintiffs, he argues that he is protected against civil liability for his actions by the doctrine of qualified immunity. Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818

11

(1982).

In Saucier v. Katz, 533 U.S. 194 (2001), the United States Supreme Court instructed that, when addressing a question of qualified immunity, courts are to first consider whether "the facts alleged show the officer's conduct violated a constitutional right." Id. at 201. Only after such a violation was established was the court to move to the a second prong of the qualified immunity question: whether at the time of the alleged violation that right was "clearly established." Id. However, the United States Supreme Court has recently held that the step-by-step protocol outlined in Saucier is not mandatory. Pearson v. Callahan, ____ U.S. ____, 129 S. Ct. 808 (January 21, 2009).

While the step-by-step procedure is now advisory, the Court finds that in the present case a step-by-step application is most useful, and after applying both steps, the Court finds that Deputy Estes is not entitled to summary judgment based upon qualified immunity because a genuine issue of material fact persists as to probable cause. If at the first step of the Saucier/Pearson analysis, Deputy Estes violated the Fourth Amendment by arresting the Plaintiffs absent a warrant without probable cause, then at the second step, the Court finds that it is clearly established that, absent a warrant, an arrest cannot be effectuated without probable cause. See Dietrich v. Burrows, 167 F.3d 1007, 1012 (6th Cir. 1999).

At this juncture and with the material facts that are in dispute, the Court simply cannot find that granting summary judgment in favor of Deputy Estes on this issue is appropriate. As the Court of Appeals for the Sixth Circuit has instructed, granting summary judgment is not appropriate where, "there is a factual dispute ( i.e., a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did

12

acts that violate clearly established rights." Poe v. Haydon, 853 F.2d 418, 426 (6th Cir. 1988). Both the question of whether a constitutional violation occurred and the question of whether such a violation would be ripe for application of qualified immunity turn upon existence of probable cause, and thus, the Court concludes that summary judgment based upon qualified immunity is not appropriate at this juncture.

*4.    Application to the Plaintiffs' Other Claims*

The probable cause determination is also a genuine issue of material fact as to the many of the other claims against Deputy Estes— i.e. wrongful arrest; false imprisonment; excessive force; assault and battery; and unlawful seizure. Because a genuine issue of material fact persists as to these claims, summary judgment in Deputy Estes's favor is not appropriate.

Deputy Estes only specifically argued that the Plaintiff's excessive force claim, arising from the manner in which she was handcuffed, was ripe for summary judgment, and to the extent this point was argued, the Court finds that the Defendant's arguments are not well-taken. As the Court of Appeals for the Sixth Circuit has explained, "[i]n order to reach a jury on this claim, the plaintiff must allege some physical injury from the handcuffing, and must show that officers ignored plaintiff's complaints that the handcuffs were too tight." Lyons v. City of Xenia, 417 F.3d 565, 575-76 (6th Cir. 2005) (citing Neague v. Cynkar, 258 F.3d 504, 508 (6th Cir.2001) and Burchett v. Kiefer, 310 F.3d 937, 944-45 (6th Cir. 2002)).

In the present case, the Plaintiff has alleged each of these elements, and Deputy Estes's contradictory testimony on the issue creates a genuine issue of material fact on the handcuffing and excessive force issue. Ms. Childs stated that she complained that her handcuffs were too tight and that she told Deputy Estes she had undergone reconstructive surgery, to which he responded "I don't

13

give a damn what you've had." [Doc. 44 at 26]. Ms. Childs alleges that she has suffered both shoulder and wrist injuries as a result of the rough manner in which she was handcuffed. [Doc. 44 at 102]. Ms. Sills also alleges that she suffered a shoulder injury by being placed over a cruiser hood and improperly handcuffed. [Doc. 44 at 78]. In contrast, Deputy Estes maintains that, when Ms. Childs complained of shoulder pain, he agreed to handcuff her in front of her body rather than behind her back. [Doc. 35-2 at 3]. Accordingly, the Court finds that summary judgment is not appropriate on the claim of excessive force.

As to the other against Deputy Estes—i.e. wrongful arrest; false imprisonment; assault and battery; and unlawful seizure. Ms. Childs explained that Deputy Estes entered the bank and ordered Ms. Childs to raise her hand. Ms. Childs stated that she complained that she could not raise her arms, but Deputy Estes responded by saying that "he didn't give a f___ what was wrong with [Ms. Childs or Ms. Sills] . . . that he was there to arrest me for counterfeiting and money laundering." [Doc. 44 at 25-26]. Ms. Childs recalled Ms. Sills and herself being "pushed . . . to the hood of [a] police car." [Doc. 44 at 37]. Ms. Childs stated that she and Ms. Sills were then placed in a police cruiser which was left running, but which did not have its air-conditioning on. [Doc. 44 at 38]. Ms. Childs also stated that upon being brought to the Justice Center she asked to use the restroom and was told that she could not. [Doc. 44 at 39]. Ms. Childs also maintains that Deputy Estes stole three hundred and fifty dollars that were in her day-planner at the time of her arrest. [Doc. 44 at 61].

Ms. Sills recalled similar use of profanity and rough handcuffing. [Doc. 44 at 70]. Ms. Sills, like Ms. Childs, recalled being put in a police cruiser that was hot, [Doc. 44 at 70], and estimated that at least two hours passed from the time officers arrived until the time the women were transferred to Officer Upton's cruiser. [Doc. 44 at 71].

14

In contrast, Deputy Estes claims that upon arriving at the bank, he approached the women and instructed them to put their hands in the air, without using a loud tone. [Doc. 35-2 at 2]. Deputy Estes denied ever placing the women over the hood of his cruiser [Doc. 35-2 at 3]. As to the air-conditioning, Deputy Estes said "the windows were up due to the air conditioner running. I didn't want the cold air to come out." [Doc. 35-2 at 4]. Deputy Estes estimated that he was at the bank for thirty minutes prior to the women being transferred to Officer Upton's car. [Doc. 35-2 at 4].

Given this testimony and the issues of material fact that remain on the issue of probable cause, the Court finds that at this juncture summary judgment is not appropriate on these additional tort claims.

5.  *Infliction of Emotional Distress*

Finally, the Plaintiffs claim that Deputy Estes's conduct "constitutes outrageous conduct" and that the "conduct of the Defendants, individually and collectively, inflicted intractable emotional distress upon the Plaintiffs." [Doc. 1 at ¶ 44]. The Court will interpret these allegations, which are contained in the same paragraph of the Complaint to be a claim for intentional infliction of emotional distress because, under Tennessee law, "[i]ntentional infliction of emotional stress and outrageous conduct are simply different names for the same cause of action . . . ." Lyons v. Farmers Ins. Exchange, 26 S.W.3d 888, 893 (Tenn. Ct. App. 2000).

Neither party ever specifically addressed the merits of summary judgment on this issue, and the Defendants' motion does not specifically move for summary judgment on this claim. Accordingly, the Court finds that, at this time, the Defendants are not entitled to a judgment on this claim as a matter of law.

15

### C. Loudon County

In addition to making the above identified claim for emotional distress and/or outrageous conduct against Loudon County, the Plaintiffs also claim that Loudon County is liable for the alleged violations of the Plaintiffs' constitutional rights.

However, in order to impose liability on the County under 42 U.S.C. § 1983, the Plaintiffs must demonstrate that there was some official governmental policy or custom in place that was the moving force behind the violation of the Plaintiffs' constitutional rights. See Monell v. Dep't of Soc. Services of New York, 436 U.S. 658, 691 (1978). After examining the evidence before it, the Court concludes the Plaintiffs have set forth sufficient evidence from which a reasonable juror could conclude that Loudon County has a policy of detaining persons without probable cause in the nature of an investigatory detention and in a fashion that amounts to arrest on less than probable cause for the purposes of investigating to determine if there is probable cause. The jury could also conclude the County's detention/arrest policies are constitutional and not the moving force behind the Plaintiffs' arrests.

Accordingly, because a genuine issue of material fact persists as to the presence of probable cause and because the Plaintiffs have pled and proffered sufficient evidence to support a finding of an unconstitutional policy, Loudon County is not entitled to summary judgment on the constitutional claim against it.

## IV. CONCLUSION

In sum, the Defendants' Motion for Summary Judgment **[Doc. 34]** is **GRANTED to the extent it seeks summary judgment in Defendant Sheriff Tim Guider's favor**. Accordingly, Sheriff Guider is **DISMISSED** as a party to this action. However, all other relief sought in the Defendants' Motion for Summary Judgement **[Doc. 34]** is **DENIED**. This matter shall proceed to trial on the claims against Deputy Estes and Loudon County on **January 26, 2010.**[3]

**IT IS SO ORDERED**.

ENTER:

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[3]To the extent the Plaintiffs raised the issue of spoliation in their Response [Doc. 42 at 8-9], the Court finds that the Plaintiffs concerns are best addressed by a jury instruction on the issue, and accordingly, any prayer for relief contained in the Response is not well-taken and is denied.

17